FILED
United States Court of Appeals
Tenth Circuit

June 14, 2021

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DANIELLE L. NERI,

    Plaintiff - Appellant,

v.

BOARD OF EDUCATION FOR
ALBUQUERQUE PUBLIC SCHOOLS;
CYNTHIA HOPPMAN,

    Defendants - Appellees.

------------------------------

UNITED STATES OF AMERICA,

    Amicus Curiae.

No. 20-2088
(D.C. No. 1:19-CV-00008-JCH-SCY)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BRISCOE**, and **CARSON**, Circuit Judges.
_____

Danielle Neri, proceeding pro se, appeals from the grant of summary judgment

to the defendants, the Board of Education of Albuquerque Public Schools and

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Cynthia Hoppman (collectively, "APS"), in her suit under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111-12117. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part for further proceedings.

## BACKGROUND

Mrs. Neri worked for APS as a special education math teacher for several years. Starting in the 2013-2014 school year, however, she was chosen to fill a new position as the Individualized Educational Program (IEP) Teacher at a high school in Albuquerque with a large number of special-education students. As the IEP Teacher, her duties included ensuring that the school met federal standards for special education; creating procedures for IEPs; training teachers on IEP requirements; and facilitating and conducting meetings with students, parents, teachers, and service providers regarding students' IEPs. Mrs. Neri's first two school years as the IEP Teacher were uneventful.

Things changed in the 2015-2016 school year. Mrs. Neri asserts that she "was under a yearlong attack, a group hunt orchestrated by" her supervisor, Ms. Hoppman. Aplt. Opening Br. at 18. "This attack was not so obvious to the observer, but it was to Mrs. Neri." *Id.* "Ms. Hoppman would change the requirements of the IEP teacher position[,] even procedures they had come up with, that had been proven to work." *Id.* (footnote omitted). "Ms. Hoppman sought to create a false paper trail showing Mrs. Neri was not doing her job" by sending e-mail messages inquiring as to the status of various IEPs. *Id.* One time, she sent an e-mail inquiring as to Mrs. Neri's whereabouts, after the end of the duty day.

2

On April 14, 2016, Mrs. Neri led an IEP meeting for a student whose parent did not speak English. Daniel Kegler, a teacher attending the meeting, had not arranged for an interpreter to attend. When Mrs. Neri realized there was no interpreter, she cancelled the meeting. Mr. Kegler became frustrated. As Mrs. Neri describes, he "stood up with such force that his chair flew into the wall behind him, he then grabbed it and slammed it into the table, then slammed his laptop shut with his hand about 18 inches from Mrs. Neri's face." *Id.* at 19-20.

The April 14 incident frightened Mrs. Neri and triggered her Post-Traumatic Stress Disorder (PTSD). She told Ms. Hoppman of the incident, her feeling that Mr. Kegler had assaulted her, and that he triggered her PTSD. Ms. Hoppman interviewed other staff members who had been in the meeting, who reported that Mr. Kegler had not been violent. Ms. Hoppman told Mrs. Neri that she did not think the incident was a big deal.

The next day, April 15, Mrs. Neri had another IEP meeting involving Mr. Kegler. Ms. Hoppman sent a head teacher to attend the meeting with Mr. Kegler. Initially Mrs. Neri thought the head teacher was there to support her in case Mr. Kegler again lashed out. But during the meeting, she learned that Ms. Hoppman had sent the head teacher to support Mr. Kegler because she had just given him some bad news. Mrs. Neri believed that Ms. Hoppman had minimized her feelings about the April 14 incident, and she felt betrayed, unsupported, and unsafe.

Mrs. Neri took leave under the Family and Medical Leave Act (FMLA) from April 26 to May 9, 2016. Her leave was supported by a note from her therapist,

3

licensed clinical social worker Billie Poteet.  When Mrs. Neri returned to work, with only nine days left in the school year, she attempted to meet with Ms. Hoppman to discuss potential accommodations for her PTSD, but Ms. Hoppman avoided her.

On May 23, 2016, Ms. Hoppman conducted Mrs. Neri's year-end evaluation. Mrs. Neri felt that the evaluation was going well, until Ms. Hoppman told her that she (Ms. Hoppman) was transferring her (Mrs. Neri) to a special education math teacher position because Mrs. Neri "could not handle the contention of that room" and Ms. Hoppman "didn't want to trigger [Mrs. Neri] again."  R. Vol. 1 at 268. Mrs. Neri considered the transfer to be a demotion.  That night, she sent Ms. Hoppman an e-mail protesting the decision.  Ms. Hoppman responded by identifying several areas in which Mrs. Neri had performed deficiently as the IEP Teacher during the 2015-16 school year, allegedly leading to her decision to transfer Mrs. Neri.  She also stated, "[o]n a personal level, I am concerned about your health. I have seen your reactions to stressful situations become more apparent and frequent. The comments you made in your email exhibit a paranoia that you are being isolated and targeted."  *Id.* Vol. 2 at 79.

Mrs. Neri took an unpaid personal leave of absence for the 2016-2017 school year.  On March 8, 2017, she submitted her resignation to APS.

Mrs. Neri then filed suit in state court, bringing claims under the ADA as well as state-law claims.  The defendants removed the case to federal court.  After discovery, the defendants moved for summary judgment on all claims.  Mrs. Neri opposed the motion.  After hearing oral arguments, the magistrate judge

4

recommended that the district court grant summary judgment to the defendants on the ADA claims, but remand the state-law claims to state court. Mrs. Neri timely objected. The district court accepted the recommendation, granting summary judgment to the defendants on the ADA claims and remanding the state-law claims. Mrs. Neri appeals.[1]

## DISCUSSION

"We review the grant of summary judgment de novo applying the same standard as the district court." *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Mrs. Neri proceeds pro se, we construe her filings liberally. *See Gallagher v. Shelton*, 587 F.3d 1063, 1067 (10th Cir. 2009).

## I.    Discrimination

The ADA prohibits covered entities from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job

---

[1] Mrs. Neri filed a Fed. R. Civ. P. 59(e) motion on the same day she filed her notice of appeal as to the final judgment. The notice of appeal ripened as to the final judgment when the district court denied her Rule 59(e) motion. *See* Fed. R. App. P. 4(a)(4)(B)(i). But because Mrs. Neri did not file a new or amended notice of appeal addressing the denial of her Rule 59(e) motion, this appeal is limited to the final judgment. *See* Fed. R. App. P. 4(a)(4)(B)(ii); *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1009-10 (10th Cir. 2018).

5

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." *Id.* § 12112(b)(1).

The district court proceeded under the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).[2] Under that framework, Mrs. Neri must establish a prima facie case, which requires her to show she "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the

---

[2] It is not clear that the *McDonnell Douglas* framework is appropriate in this case. That framework applies when a plaintiff does not present direct evidence of discrimination. *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 995 (10th Cir. 2019). Mrs. Neri, however, presented evidence that when Ms. Hoppman informed her of the transfer, Ms. Hoppman stated that the transfer was to avoid triggering Mrs. Neri's PTSD. If believed by a factfinder, this statement would be direct evidence of discrimination on the basis of Mrs. Neri's PTSD. *See id.* ("Oral or written statements on the part of a defendant showing a discriminatory motivation may . . . constitute direct evidence of discrimination." (brackets and internal quotation marks omitted)).

The parties, however, do not argue that the district court applied the incorrect framework. And even considering the case through a direct-evidence lens, to proceed with an ADA discrimination claim Mrs. Neri must show that she is a "qualified individual" with a "disability," 42 U.S.C. § 12112(a), and that Ms. Hoppman's decision to limit or classify her "adversely affect[ed] [her] opportunities or status . . . because of [her] disability," *id.* § 12112(b)(1). Thus, regardless of the *McDonnell Douglas* framework, Mrs. Neri must still present sufficient evidence of a disability and an adverse action to survive summary judgment.

6

job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1037-38 (10th Cir. 2011) (internal quotation marks omitted). To satisfy the third prong, "a plaintiff generally must show that [s]he has suffered an adverse employment action because of the disability." *Id.* at 1038 (internal quotation marks omitted). The parties and the district court focused on the first and third prongs; there was no dispute as to the second prong. The district court determined that Mrs. Neri failed to establish that the transfer was an adverse employment action. It therefore did not need to consider whether she showed that she has a disability.

As explained below, there are genuine issues of material fact as to whether the transfer constituted an adverse employment action. And although we may affirm on other grounds supported by the record, *see Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 899 (10th Cir. 2017), there also are genuine issues of material fact as to whether Mrs. Neri has a "disability" as that term is defined by the ADA.

## A.    "Disability" as Defined by the ADA

To proceed with her ADA discrimination claim, Mrs. Neri must establish that she has a "disability." She may do this by showing she (1) has "a physical or mental impairment that substantially limits one or more of [her] major life activities"; (2) has "a record of such an impairment"; or (3) was "regarded as having such an impairment." 42 U.S.C. § 12102(1). In this case, the parties focused on the first and

7

third definitions of disability, actual impairment and "regarded as having" an impairment.[3]

### 1. Actual Impairment

To proceed based on an actual impairment, an ADA plaintiff must (1) show she has "a recognized impairment"; (2) "identify one or more appropriate major life activities"; and (3) "show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014) (internal quotation marks omitted). Mrs. Neri presented her therapist's testimony to establish that she has been diagnosed with PTSD. And she asserts that her "PTSD[,] when active, substantially limits major life activities of sleeping, thinking, concentrating, [performing] manual tasks, speaking, breathing, communicating, and caring for herself, as well as it substantially limits major bodily functions of the brain and respiratory systems." R. Vol. 2 at 13. The issue thus becomes whether she has adequately established that her PTSD substantially limits at least one major life activity.

The ADA does not require expert testimony in every case. *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 996 (10th Cir. 2019). "Rather, whether medical evidence is necessary to support a disability discrimination claim is a

---

[3] On appeal, Mrs. Neri asserts that she also has a record of PTSD. But it does not appear that she adequately argued that issue in the district court. *See* R. Vol. 2 at 239 (Report & Recommendation) ("The parties do not address whether Plaintiff has a record of impairment. Instead, their arguments focus on whether Plaintiff has an actual impairment or whether Defendants regarded her as having an impairment."). We therefore do not address the issue.

determination that must be made on a case-by-case basis." *Id.* (brackets and internal quotation marks omitted). "[A] lay witness is competent to testify concerning those physical injuries and conditions which are susceptible to observation by an ordinary person." *Felkins*, 774 F.3d at 652 (internal quotation marks omitted). But "[w]here injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts." *Id.* (internal quotation marks omitted).

Accordingly, Mrs. Neri could testify about the physical and mental symptoms she experienced. *See id.* But she is not competent to testify that those symptoms were caused by PTSD or to opine on the physical or mental effects of PTSD generally, "for those are clearly matters beyond the realm of common experience and require the special skill and knowledge of an expert witness." *Id.* (ellipsis and internal quotation marks omitted). *See Clancy v. Miller*, 837 F. App'x 630, 635-36 (10th Cir. 2020) (requiring plaintiff to present expert testimony to link her PTSD to a limitation on a major life activity), *cert. denied*, 209 L. Ed. 2d 537 (U.S. Apr. 5, 2021) (No. 20-7399).[4]

We do not dispute that Mrs. Neri has provided sufficient evidence that she has been diagnosed with PTSD. As stated, she offered her therapist, Ms. Poteet, as an expert witness regarding that issue. But in her deposition, Ms. Poteet stated that the

---

[4] An unpublished opinion generally is not binding, but the court may rely on it for its persuasive value. *See* Fed. R. App. 32.1(a); 10th Cir. R. 32.1(A).

9

only expert opinion she would offer "is whether, in fact, [Mrs.] Neri has PTSD." R. Vol. 1 at 283. Mrs. Neri does not point to any opinion by Ms. Poteet linking any of her alleged limitations to her PTSD. But it is that type of medical evidence that she must present.[5] As in *Felkins*, "the failure of proof on which our decision turns is that [the plaintiff] has not provided proper evidence that any limitation she may have is *caused* by [her claimed condition]." 774 F.3d at 652-53.

Mrs. Neri relies on 29 C.F.R. § 1630.2, which provides that "[g]iven their inherent nature, [some] types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity." 29 C.F.R. § 1630.2(j)(3)(ii). "[I]t should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . post-traumatic stress disorder . . . substantially limit[s] brain function . . . ." *Id.* § 1630.2(j)(3)(iii). But we are not persuaded that in this case the general provisions of § 1630.2(j)(3) overcome the need for expert medical evidence to connect Mrs. Neri's alleged symptoms to her PTSD.

Because Mrs. Neri did not present medical evidence to link her PTSD diagnosis with her symptoms to establish that her PTSD substantially limits at least

---

[5] In her summary-judgment response, Mrs. Neri supplied a letter from her current psychiatrist, Stephanie Tucker, M.D., stating that at some unspecified time, she had diagnosed Mrs. Neri with PTSD. But Mrs. Neri did not timely disclose Dr. Tucker as an expert witness. Moreover, the letter does nothing more than offer a diagnosis, which is not disputed; Dr. Tucker did not discuss any limitations caused by Mrs. Neri's PTSD.

one major life activity, we affirm the grant of summary judgment on claims based on the actual impairment definition of "disability" under the ADA.

## 2. "Regarded As" Disabled

The ADA also defines "disability" as "regarded as having [a physical or mental] impairment." 42 U.S.C. § 12102(1)(C). This definition is satisfied "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). "[T]he only qualification for an impairment in a 'regarded as' claim is that the impairment not be 'transitory and minor.'" *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016) (quoting § 12102(3)(B)). Thus, although Mrs. Neri must present medical evidence to establish substantial limitations with regard to actual impairment, she need not present such evidence to proceed under the "regarded as" definition.

"[F]or a plaintiff alleging disability discrimination to show that the employer regarded [her] as having an impairment, the plaintiff must show that (1) [s]he has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." *Id.* Except where an impairment is transitory and minor, "an individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or

11

perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action." 29 C.F.R. § 1630.2(l)(2).

The record contains evidence that, if believed, would establish each of *Adair*'s requirements for establishing a "regarded as" disability. First, Mrs. Neri presented Ms. Poteet's testimony that she has been diagnosed with PTSD. Second, record evidence shows that her PTSD is not "transitory and minor." *See* § 12012(3)(B) (stating that "transitory" means the impairment has "an actual or expected duration of 6 months or less"). In a note to APS, Ms. Poteet described Mrs. Neri's condition as "chronic" and stated that she had treated Mrs. Neri since 2013. R. Vol. 2 at 97-98. And other medical records also indicate Mrs. Neri was diagnosed with PTSD starting in 2013. Third, Mrs. Neri's testimony that she told Ms. Hoppman that Mr. Kegler triggered her PTSD, and that Ms. Hoppman told her the transfer was to avoid triggering her PTSD in the future, is evidence that Ms. Hoppman knew of and perceived Mrs. Neri's PTSD at the time of the transfer.

In similar circumstances, other circuit courts have held that it was inappropriate to grant summary judgment on a "regarded as" claim. In *Lewis v. City of Union City*, 934 F.3d 1169, 1173 (11th Cir. 2019), the plaintiff had suffered a heart attack. When her employer, the police department, scheduled her for pepper spray and Taser training, she expressed concern that her prior heart attack might make her more susceptible than the average officer to injury from the training. *Id.* at 1174. The police department placed her on leave pending medical clearance before terminating her employment. *Id.* at 1175-76. The Eleventh Circuit affirmed the

12

district court's conclusion that the officer had not established that her heart impairment substantially affected a major life activity, and therefore she could not proceed under the actual impairment definition of "disability." *Id.* at 1180-81. But the court further held that her evidence was sufficient to proceed under a "regarded as" theory. *Id.* at 1181-82. "[T]he department's own stated reason for putting Lewis on leave—that it feared for her safety in view of her heart condition—demonstrates the department's belief that Ms. Lewis's medical condition set her apart from other police officers." *Id.* at 1181. Moreover, discussing interpretative guidance that accompanies the regulations implementing the ADA, the court stated, "[w]hile not binding, the guidance illustrates the common sense principle that an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled." *Id.* at 1182.

Similarly, in *Silk v. Board of Trustees*, 795 F.3d 698, 702 (7th Cir. 2015), the plaintiff was an adjunct professor at a community college who underwent heart surgery near the end of the spring semester. He then was assigned only two courses for the fall semester, rather than the usual four courses. *Id.* at 701, 703. He testified that a department chair stated that "we assigned [him] only two classes in the fall because we didn't think he was physically capable of handling them." *Id.* at 708 (brackets and internal quotation marks omitted). The department chair denied making the remark, but the Seventh Circuit held that "if a jury credited Silk's testimony . . . , it could reach the conclusion that the statement constituted an admission on the part of the College that it reduced Silk's course load as the result of

13

a perceived impairment." *Id.* Accordingly, the court held that summary judgment was not appropriate. *Id.*

Here, the district court did not resolve the "regarded as" issue because it held that Mrs. Neri had failed to show an adverse employment action. But it noted that "[a] 'regarded-as' disability requires a showing that the Defendants *mistakenly* 'believe[] that a person has a physical impairment that substantially limits one or more life activities,' or Defendants *mistakenly* believe[] that an actual, nonlimiting impairment substantially limits one or more major life activities." R. Vol. 2 at 326 n.2 (quoting *Lanman v. Johnson Cnty.*, 393 F.3d 1151, 1156 (10th Cir. 2004)). *Lanman*, however, relied on *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). *See Lanman*, 393 F.3d at 1156. And *Sutton* was abrogated by the ADA Amendments Act of 2008 (ADAAA). *See Adair*, 823 F.3d at 1305. As discussed in *Adair*, the ADAAA changed the requirements of a "regarded-as" claim to move away from showing substantial limitation. *See id.* at 1304-06. Thus, in addressing cases that arise after the ADAAA, courts cannot indiscriminately quote cases such as *Lanman* that rely on *Sutton*.[6]

In sum, because Mrs. Neri has established a genuine issue of material fact as to the "regarded as" definition of disability, we cannot affirm the grant of summary judgment on that alternate ground.

---

[6] In its discussion of the "regarded as" definition, APS relies on *EEOC v. BNSF Railway Co.*, 853 F.3d 1150 (10th Cir. 2017), which contains language similar to *Lanman*. But *BNSF Railway* involved conduct that occurred before the effective date of the ADAAA, and it applied pre-ADAAA law. *See id.* at 1155 n.2.

## B.     Adverse Employment Action

Mrs. Neri pointed to three potential adverse actions: (1) the transfer from IEP Teacher to special education math teacher, (2) a hostile work environment, and (3) constructive discharge. We hold that she created a genuine issue of material fact regarding whether the transfer was a demotion. But we are not persuaded that a reasonable factfinder could conclude that the school was an objectively hostile work environment or that the conditions were so intolerable that she was constructively discharged.

### 1.     Transfer as a Demotion

Mrs. Neri challenges the district court's conclusion that the transfer to the math-teacher position was not a demotion. The district court relied on the facts that the contract for APS teachers did not differentiate the IEP Teacher position, and that Mrs. Neri would earn the same salary and receive the same medical and dental benefits in both positions. But Mrs. Neri presented evidence that the skills and responsibilities of the math teacher position differed from the IEP Teacher position. Under these circumstances, we are persuaded that a reasonable factfinder could conclude that the transfer was a demotion. We thus agree with Mrs. Neri that the district court erred in granting summary judgment on this ground.

"The Tenth Circuit liberally defines the phrase 'adverse employment action.' Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532

15

(10th Cir. 1998) (citations and internal quotation marks omitted). "Conduct rises to the level of adverse employment action when it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (internal quotation marks omitted). But "we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Sanchez*, 164 F.3d at 532 (internal quotation marks omitted). An employee's positive or negative feelings about a transfer do not play a role in the analysis. *Id.* at 532 n.6.

In *Sanchez*, we held that an elementary school teacher's reassignment from teaching fourth grade at one school to teaching second grade at a different school did not qualify as an adverse employment action. *Id.* at 530, 532. Unlike in *Sanchez*, however, Mrs. Neri was not being transferred from one classroom teaching position to another, relatively similar classroom teaching position. Rather, she was being transferred from the IEP Teacher position to a classroom teaching position.

We have recognized that a reassignment involving "a de facto reduction in responsibility" and "a lesser degree of skill" can create a jury question as to whether a transfer was a demotion. *Stinnett*, 337 F.3d at 1217; *see also Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 799 (10th Cir. 1993) (acknowledging that a reassignment may be a demotion if "the employee can show that [s]he receives less pay, has less responsibility, or is required to utilize a lesser degree of skill than [her] previous assignment"), *overruled on other grounds by Buchanan v. Sherrill*,

16

51 F.3d 227, 229 (10th Cir. 1995) (per curiam).[7] This case presents a close question, but we are persuaded that Mrs. Neri presented sufficient evidence for a factfinder to conclude that the IEP Teacher position has different and greater responsibilities than a special education math teacher.

During Mrs. Neri's tenure as IEP Teacher, the primary duties were creating IEPs and facilitating IEP meetings, rather than teaching students. She also was tasked with helping to ensure that APS complied with federal law regarding students' rights to education. It was the IEP Teacher who created procedures and taught the other teachers with regard to the requirements. Further, APS's IEP policy specified only certain categories of employees could serve as APS's representative in an IEP meeting because only those individuals had the required knowledge about the student, the curriculum, and the district's resources. And the policy provided that "[t]he individual assigned to serve as the Albuquerque Public Schools representative in an IEP Team meeting shall have the authority to commit Albuquerque Public Schools resources and shall be able to ensure that whatever services are described in the IEP will be provided." Suppl. R. Vol. 1 at 251. Such evidence is sufficient to allow a reasonable jury to conclude that the IEP Teacher position required greater

---

[7] The United States has submitted an amicus brief urging the court to allow plaintiffs to bring an ADA discrimination claim based on a purely lateral transfer. "The [plaintiffs] do not assert this argument, nor was it argued below, and we therefore decline to address it." *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1558 n.15 (10th Cir. 1997).

skill and carried greater responsibility with regard to special education than a classroom teaching position.

There also is evidence that the IEP Teacher position was equated to a head teacher position. For example, a head teacher substituted for Mrs. Neri when she was unavailable to attend an IEP meeting. In addition, defendants' counsel informed Mrs. Neri that "[i]t is APS' understanding that . . . while you were in the system as a special education teacher you shared the responsibilities of the head teacher." R. Vol. 2 at 38. It is a reasonable inference in favor of Mrs. Neri that a head teacher position would be a more prestigious position than regular classroom teacher.

Accordingly, Mrs. Neri has established a genuine issue of material fact as to whether her transfer was a demotion and therefore an adverse employment action.

### 2. Hostile Work Environment

Mrs. Neri alleges that Ms. Hoppman created a hostile work environment throughout the 2015-2016 school year. To avoid summary judgment on a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1171 (10th Cir. 2018) (internal quotation marks omitted). The environment must have been "both objectively and subjectively hostile." *Id.* "We assess the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (emphasis and internal

18

quotation marks omitted). "In evaluating the circumstances, we consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (brackets and internal quotation marks omitted).

Mrs. Neri complains about the following:

Ms. Hoppman continually harassed her throughout the 2015/2016 school year; Ms. Hoppman changed her job's expectations and benefits throughout the 2015/2016 school year; in the April 14, 2016 IEP meeting Mr. Kegler shoved his chair into the wall and slammed his laptop shut; Ms. Hoppman told [her] that the April 14, 2016 incident was 'no big deal'; and Ms. Hoppman sent support for Mr. Kegler at the April 15, 2016 IEP meeting.

R. Vol. 2 at 244-45. We agree with the district court that Mrs. Neri failed to show that these incidents were either pervasive or severe enough to create an objectively hostile work environment. Therefore, for substantially the reasons discussed by the magistrate judge and the district court, we affirm the grant of summary judgment to the defendants on the hostile work environment allegations.

### 3. Constructive Discharge

Mrs. Neri also challenges the ruling on constructive discharge. "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017) (brackets and internal quotation marks omitted). "To establish constructive discharge, a plaintiff must show that she had no other choice but to

19

quit." *Id.* (internal quotation marks omitted). "A finding of constructive discharge must not be based only on the discriminatory act; there must also be aggravating factors that make staying on the job intolerable." *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 992 (10th Cir. 1994). The employee's "subjective views of the situation are irrelevant"; "she must instead show the conditions of employment were objectively intolerable." *Hiatt*, 858 F.3d at 1318 (brackets and internal quotation marks omitted).

In *James*, we recognized that "[a] perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify [a] finding of constructive discharge." 21 F.3d at 993. But although Mrs. Neri perceived the transfer to be a demotion, she has not shown that a reasonable jury could find the conditions of the math teacher position so "objectively intolerable" that she "had no other choice but to quit." *Hiatt*, 858 F.3d at 1318 (internal quotation marks omitted).

In *James*, for example, the employees "had a choice between two options: lose benefits under early retirement; or continue to work while being harassed or moved to jobs where unreachable quotas could be used as a pretext for firing them." 21 F.3d at 993. We noted that "[n]one of the Plaintiffs was offered a choice of continuing work at the same pay or accepting the buy-out or early retirement." *Id.* In contrast, Mrs. Neri was offered a job making the same salary and carrying the same medical and dental benefits that she would have had as the IEP Teacher. As we stated above, it is a close question as to whether a jury could find the transfer was a demotion. The

20

standard for constructive discharge is higher, however, and no reasonable jury could conclude that the circumstances here rise to that level. *See Hiatt*, 858 F.3d at 1318 (concluding that the plaintiff failed to establish a constructive discharge, even though she had been demoted); *Tran v. Trs. of State Colls.*, 355 F.3d 1263, 1270-71 (10th Cir. 2004) (recognizing that "conduct which meets the definition of a 'tangible employment action' or an 'adverse employment action' is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable").

## II.    Retaliation

Mrs. Neri asserts that the district court erred in granting summary judgment on her retaliation claim. It is not clear whether Mrs. Neri properly asserted a retaliation claim; the magistrate judge stated that "[a]lthough Plaintiff has generally asserted that Defendants retaliated against her, she does not bring a cognizable legal claim for retaliation." R. Vol. 2 at 254. But he went on to analyze the principles for retaliation claims and recommend that the district court grant summary judgment to the defendants because she had not shown that the transfer was an adverse employment action. *See id.* at 255-56. The district court did not address retaliation.

In light of our decision that Mrs. Neri established a genuine issue of material fact as to whether the transfer was a demotion, we vacate the grant of summary judgment regarding retaliation. On remand, the district court may choose to examine

21

whether Mrs. Neri properly asserted a retaliation claim before conducting further proceedings on any such claim.

## III.    Failure to Accommodate

At a summary-judgment hearing before the magistrate judge, Mrs. Neri asserted that APS had failed to accommodate her PTSD.  The magistrate judge recommended granting summary judgment on failure to accommodate because any such claim (1) would be untimely, because it was not included in the complaint or the summary-judgment briefing, (2) would fail, because Mrs. Neri did not provide medical information to APS to start the interactive accommodation process, and (3) was not adequately explained, because Mrs. Neri did not sufficiently set forth what her requested accommodation—to feel supported—would entail.

In her objections, Mrs. Neri took issue with the conclusion that she did not engage in the interactive process.  The district court held, however, that "[e]ven if Plaintiff is correct that that she requested an accommodation . . . the Magistrate Judge found that her ADA claim for failure to accommodate should fail for two other reasons," namely untimeliness and failure to explain her requested accommodation. *Id.* at 328.  The district court agreed with the magistrate judge and overruled the objections.

Before this court, Mrs. Neri again focuses on the conclusion that she did not engage in the interactive process, and she also argues that she did explain her requested accommodation.  But she does not adequately challenge the district court's

determination that she did not timely bring a claim for failure to accommodate.[8] This omission is fatal. "If the district court states multiple alternative grounds for its ruling and the appellant does not challenge all those grounds in the opening brief, then we may affirm the ruling." *Rivero v. Bd. of Regents*, 950 F.3d 754, 763 (10th Cir. 2020).

## CONCLUSION

The district court's judgment is affirmed with regard to Mrs. Neri's allegations that APS discriminated against her because of an actual impairment, that she suffered a hostile work environment and a constructive discharge, and that APS failed to accommodate her PTSD. The judgment is reversed and remanded for further proceedings with regard to her claim of discrimination by being demoted because APS regarded her as being disabled and her claim of retaliation.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[8] The bare statement that the "[t]rial court erred when it determined that Mrs. Neri's failure to accommodate claim was untimely," Aplt. Opening Br. at 2-3, is not adequate briefing.

23